UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                :

UNITED STATES OF AMERICA

                :

        - v. -

                :      20 Cr. 660 (ALC)

MELSA SKRAPALLIU,

                :

        Defendant.

                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND RELEASE GRAND JURY MINUTES

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Samuel Raymond
David R. Felton
Assistant United States Attorneys

    - Of Counsel -

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

FACTUAL BACKGROUND....................................................................................................... 1

    A. Skrapalliu's Relationship With Iseni ............................................................................. 2

    B. CS-1's Sting Operation ................................................................................................. 2

    C. Skrapalliu Lies to the FBI ............................................................................................. 4

    D. Indictment, Arrest, and Claim...................................................................................... 6

ARGUMENT.............................................................................................................................. 6

    I. The Defendant's Arguments Fail on the Merits ............................................................. 6

        1. Applicable Law.......................................................................................................... 6

            a. Motion to Dismiss Standard................................................................................. 6

            b. Grand Jury Minutes............................................................................................. 7

            c. Elements of the Charged Offenses ...................................................................... 8

    B. Discussion ..................................................................................................................... 9

        1. The Motion to Dismiss Should Be Denied .............................................................. 9

        2. The Motion for Inspection of Grand Jury Minutes Should Be Denied ..................... 11

CONCLUSION........................................................................................................................... 12

## Table of Authorities

**Cases**                                                                      **Page(s)**

*Costello v. United States*,
  350 U.S. 359 (1956) ................................................................................................ 7

*Dennis v. United States*,
  384 U.S. 855 (1966) ................................................................................................ 7

*Douglas Oil Co. v. Petrol Stops Northwest*,
  441 U.S. 211 (1979) ................................................................................................ 8

*In re Petition of Craig*,
  131 F.3d 99 (2d Cir. 1997)...................................................................................... 7

*Pittsburgh Plate Glass Co. v. United States*,
  360 U.S. 395 (1959) ................................................................................................ 7

*United States v. Alfonso*,
  143 F.3d 772 (2d Cir. 1998) .................................................................................. 6

*United States v. Butler,*
  S1 04 Cr. 340 (GEL), 2004 WL 2516672 (S.D.N.Y. Nov. 4, 2004)...................................... 11

*United States v. Casamento*,
  887 F.2d 1141 (2d Cir. 1989) ............................................................................... 11

*United States v. Dawkins*,
  999 F.3d 767 (2d Cir. 2021) .......................................................................... 7, 11

*United States v. Ferrara*,
  788 F. App'x 748 (2d Cir. 2019) ........................................................................... 9

*United States v. Gambino*,
  809 F. Supp. 1061 (S.D.N.Y. 1992), *aff'd*, 17 F.3d 572 (2d Cir. 1994) ................................ 11

*United States v. Gibson*,
  175 F. Supp. 2d 532 (S.D.N.Y. 2001) ................................................................... 8

*United States v. Halloran*,
  664 F. App'x 23 (2d Cir. 2016) ............................................................................ 6

*United States v. Helbrans*,
  547 F. Supp. 3d 409 (S.D.N.Y. 2021) ............................................................. 8, 12

*United States v. Johnson*,
  319 U.S. 503 (1943) ................................................................................................ 8

*United States v. Leung*,
  40 F.3d 577 (2d Cir. 1994) ............................................................................. 7, 8

*United States v. Mechanik,*
    475 U.S. 66 (1986) ............................................................................................. 7

*United States v. Moten,*
    582 F.2d 654 (2d Cir. 1978) ......................................................................... 12

*United States v. Persico,*
    645 F.3d 85 (2d Cir. 2011) ....................................................................... 8, 10

*United States v. Procter & Gamble Co.,*
    356 U.S. 677 (1958) ......................................................................................... 8

*United States v. Rubin,*
    743 F.3d 31 (2d Cir. 2014) .................................................................... 10-11

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998) ........................................................................... 7

*United States v. Sampson,*
    898 F.3d 270 (2d Cir. 2018) ........................................................................ 7

*United States v. Sells Eng'g, Inc.,*
    463 U.S. 418 (1983) ......................................................................................... 8

*United States v. Smith,*
    985 F. Supp. 2d 547 (S.D.N.Y. 2014) ..................................................... 6

*United States v. Walsh,*
    194 F. 3d 37 (2d Cir. 1999) ......................................................................... 9

*United States v. Wedd,*
    993 F.3d 104 (2d Cir. 2021) ............................................................... 2, 6, 7

*United States v. Wells,*
    519 U.S. 482 (1997) ......................................................................................... 9

*United States v. Zemlyansky,*
    908 F.3d 1 (2d Cir. 2018) ............................................................................. 9

**Statutes**

18 U.S.C. § 1014 ...................................................................................................... 9
18 U.S.C. § 1515 ...................................................................................................... 8
18 U.S.C. § 1349 ...................................................................................................... 9

**Rules**

Fed. R. Crim. P. 12(b) ........................................................................................... 7
Fed. R. Crim. P. 29 ............................................................................................... 11

**PRELIMINARY STATEMENT**

The instant Indictment charges defendant Melsa Skrapalliu with obstruction of justice (Count Nine), bank fraud conspiracy with her associate and co-defendant, Abduraman Iseni, a/k/a "Diamond" (Count Ten), and false statements to a bank, also with Iseni (Count Eleven). Iseni pleaded guilty to and has been sentenced for, among other things, Counts Ten and Eleven, the bank fraud conspiracy and false statements charges that were filed against him and Skrapalliu for the conduct at issue. The Indictment contains the elements of the charged offenses and informs Skrapalliu of the charges; indeed, Skrapalliu does not claim otherwise. She raises only factual issues that cannot be adjudicated at the pretrial motion stage, but instead must be resolved at trial. Nor has she shown anything close to the "particularized need" required to obtain the grand jury minutes. Skrapalliu's motion to dismiss the Indictment and for grand jury minutes (the "Skrapalliu Motion"), predicated on what she represents to be a "thorough accounting" of the facts underlying the charges, thus must be denied on its face.

**FACTUAL BACKGROUND**

The Government expects that the evidence at trial will establish that in November 2020, the FBI executed a money laundering sting operation of Skrapalliu's associate and previously convicted felon, Abduraman Iseni, a/k/a "Diamond," using a confidential source ("CS-1")[1] then working with law enforcement. CS-1 told Iseni that CS-1 would repay Iseni for prior debts using the proceeds of a fraud scheme. Iseni directed CS-1 to send the money to an account at Chase Bank that Iseni said he controlled, held under the business name RJM Chelsea Road LLC (the "RJM Chase Account"). Skrapalliu was the account signatory of the RJM Chase Account. After

---

[1] At the time, CS-1 was charged with bank fraud conspiracy, and later pleaded guilty to that and other charges.

the FBI arranged for the money to be transferred to the RJM Chase Account, the Government executed a seizure warrant on the account, freezing it. When Skrapalliu was not allowed to retrieve the money, she contacted the FBI after being informed by Chase Bank that the FBI was involved in the hold. She lied to the FBI agent she spoke with about the nature of her relationship with CS-1, falsely denied that anyone other than herself was involved in the transfer, and asked the agent to relay this false information to Chase Bank in order to convince the bank to allow her to retrieve the money.

## A.  Skrapalliu's Relationship With Iseni

The Government expects the evidence at trial would show that[2] in late 2019, Skrapalliu had numerous conversations with her friend Iseni, which were intercepted via a wiretap of Iseni's phone. During those calls,[3] Iseni often referred to his criminal activity and prior criminal history, including his prior periods of incarceration.[4] After the FBI searched one of the gambling parlors Iseni owned on December 12, 2019, Iseni called Skrapalliu and told her about the search, including that the search was led by the FBI.

## B.  CS-1's Sting Operation

In or about October 2020, the FBI began working with CS-1. With CS-1's consent, the FBI recorded CS-1's telephone calls and messages from mid-October to about November 2020. CS-1 communicated frequently with Iseni and Skrapalliu during that period.

---

[2] The Government provides these facts to give context for its legal argument; this is not a "full proffer of the evidence [the Government] intends to present at trial." *United States v. Wedd*, 993 F.3d 104, 121 (2d Cir. 2021) (citation omitted).

[3] Many of the communications described herein were in Albanian; where summarized, the Government is relying on draft translations.

[4] As the Court is aware, before the instant conduct, Iseni was twice convicted of federal offenses in this District and served lengthy sentences.

The charges in this case arise from some of CS-1's recorded conversations with Iseni.  In October 2020, Iseni complained to CS-1 about debts CS-1 owed to Iseni that had been pending for years.  Iseni then agreed to consummate another business transaction with CS-1 so that CS-1 could repay Iseni.  CS-1 communicated with both Skrapalliu and Iseni about this proposed business deal.  As CS-1 told Skrapalliu on various occasions, the transaction related to "deeds."  While Skrapalliu assisted, the actual deal was supposed to be between Iseni and CS-1.  For example, in response to various questions from CS-1, Skrapalliu texted CS-1 that "[f]or the transfer to occur you need to talk to Diamond [*i.e.*, Iseni]."  On October 22, 2020, after further questions from CS-1, Skrapalliu texted, in sum and substance and in part, "I have no clue what you are referring to.  I am not inside your transactions and I never w[i]ll.  We have no business relationship together and I never will."  After further conversations about these transactions, on October 30, 2020, Skrapalliu texted, "Please coordinate with Dia [referring to 'Diamond'] regarding everything else," and later that day, "Please communicate as you have done all along this process with Dia."  After this text message, Skrapalliu had no further contact with CS-1 until November 17, 2020.

CS-1 and Iseni, on the other hand, spoke frequently about the transaction and CS-1's prior debts throughout November 2020.  On November 7, 2020, CS-1 asked if Iseni had spoken with Skrapalliu about the deeds, so "we can finish this matter."  Iseni responded that CS-1 should "Make the check."  On November 9, 2020, the two texted again.  Iseni sent CS-1 a photograph of a check, which listed the RJM Chase Account; an account which Skrapalliu opened in April 2018 and for which she was the sole signatory as of November 2020.  In a conversation soon thereafter, Iseni told CS-1 to wire $180,000 to the RJM Chase Account.  At the direction of law enforcement, CS-1 said he would do so, using money CS-1 had obtained through fraud.  On November 11, 2020, CS-1 reaffirmed that the money he would send to the RJM Chase Account would be proceeds of

3

a fraud scheme. On November 16, 2020, Iseni and CS-1 spoke on the phone. CS-1 said he would wire the money to the account Iseni had provided the next day, which CS-1 called "the one with Melsa"; Iseni interjected, however, "that's my company, that's my company." In a conversation a few minutes later, CS-1 asked if the $180,000 would cover "everything," including the prior debts CS-1 owed, to which Iseni agreed.

The following day, an FBI Special Agent ("Agent-1") accompanied CS-1 and CS-1's spouse to a bank branch, where $180,000 was wired to the RJM Chase Account. At the direction of law enforcement, the wire memo line stated, in sum and substance, "Deeds." Immediately thereafter, the FBI seized the RJM Chase Account pursuant to a seizure warrant.

## C. Skrapalliu Lies to the FBI

When they realized that Skrapalliu could not withdraw money from the RJM Chase Account, both Iseni and Skrapalliu reached out to CS-1. On or about November 19, 2020, Skrapalliu reached out to an FBI Special Agent ("Agent-1"), whose contact information she had apparently obtained from the bank. Agent-1 told Skrapalliu that he could assist in allowing Skrapalliu to withdraw the money, if she provided sufficient corroborative evidence. Skrapalliu informed Agent-1 that the transfer was repayment by CS-1 and his wife for a loan Skrapalliu had previously extended to them. On November 19, 2020, Agent-1 called Skrapalliu on a recorded line. Skrapalliu said, in sum and substance, that she had lent CS-1 and his wife tens of thousands of dollars as part of her real estate business. Agent-1 asked if the "only parties to this loan" were Skrapalliu, CS-1, and CS-1's wife. Skrapalliu responded "absolutely, just me, nobody else. No one else, absolutely no one else." Skrapalliu also provided paperwork indicating that she had sent wires totaling $150,000 to an account in the name of a restaurant CS-1 owned, which she said corroborated her extension of the credit to CS-1.

4

On November 20, 2020, Agent-1 called Skrapalliu again.  During the call, and after Agent-1 made clear that his supervisor was involved in reviewing the materials Skrapalliu had provided and the circumstances of CS-1's transfer, Skrapalliu again attempted to convince Agent-1 to get the bank to release the money, repeated her false story that CS-1's wire to the RJM Chase Account was repayment for money owed to Skrapalliu, and falsely claimed that she, CS-1, and CS-1's wife were the only people involved in the transaction.  Skrapalliu told Agent-1, in substance, that she had lent a total of $150,000 to CS-1 and his wife in May and June 2019, and that she had extended this loan without interest.  Agent-1 asked if Skrapalliu had been having conversations with CS-1 and his wife about the loan; Skrapalliu stated that "[h]e was gonna pay me back the 150 yes."

Agent-1 and Skrapalliu had the following exchange:

> Agent-1: And uh just to be clear again so you three are the only parties to this transaction, correct?
>
> SKRAPALLIU: Absolutely.  I am I am I am me my company and this company is the only group we sent.  You know I sent the money to them and they are supposed to give me the money back.

The conversation continued, and Skrapalliu denied knowing why CS-1 and his wife had sent $180,000, given that she had putatively lent them $150,000 interest-free.  Agent-1 raised the fact that the wire sent by CS-1 had the word "deed" in the memo line.  In response to Agent-1's question, "So you don't know about any deed or anything like that?", Skrapalliu said, "Not in relation with me.  Absolutely not with my money."  Towards the end of the call, Skrapalliu asked Agent-1 if he could communicate the information she provided to the bank, so she could retrieve the money.

After this call, Iseni and CS-1 spoke again.  At the direction of law enforcement, CS-1 told Iseni that FBI agents had reached out to his wife, and asked Iseni how CS-1 should respond.  Iseni said, "You say that you pay the loan back. . . .  You are paying the loan back.  You just say."  CS-

1 confirmed that this answer would mean "we are in same page." Iseni repeated that CS-1 should tell the FBI that the payment was in exchange for a loan. Iseni also stated that this was "the truth."

### D. Indictment, Arrest, and Claim

On December 10, 2020, an Indictment was unsealed, including the charges against Skrapalliu, and Skrapalliu and her co-defendants were arrested. On February 9, 2021, Skrapalliu filed a claim for the RJM Chase Account, through her counsel, James Branden, Esq., and with a sworn declaration. Skrapalliu Motion at Ex. D. In the declaration, Skrapalliu stated that CS-1 and his wife had wired $180,000 to the RJM Chase Account "[i]n repayment of the loan, with interest."

ARGUMENT

## I. The Defendant's Arguments Fail on the Merits

### 1. Applicable Law

#### a. Motion to Dismiss Standard

"A defendant faces a high standard in seeking to dismiss an indictment, because an indictment need provide the defendant only a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Smith*, 985 F. Supp. 2d 547, 561 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (summary order). "An indictment is sufficient as long as it (1) 'contains the elements of the offense charged and fairly informs a defendant of the charge against which [s]he must defend,' and (2) 'enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks omitted)). "'[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Id.* As the Supreme Court put it, so long as it is "valid on its face," an indictment returned by a grand jury "is enough to call for trial of the

6

charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). To that end, at the

Rule 12(b) stage, a court "do[es] not evaluate the adequacy of the facts to satisfy the elements of

the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) (internal

quotation marks omitted).

Additionally, the Second Circuit has long held that "summary judgment does not exist in

federal criminal procedure." *Wedd*, 993 F.3d at 121 (citing *United States v. Sampson*, 898 F.3d

270, 282 (2d Cir. 2018)); *Sampson*, 898 F.3d at 281 ("Even more fundamentally, authorizing

district court judges to resolve dispositive fact-based evidentiary disputes on Rule 12(b) motions

risks invading the inviolable function of the jury in our criminal justice system." (internal

quotation marks omitted)). Thus, the "district court must give the Government an opportunity to

'make a detailed presentation of the entirety of the evidence before ... dismiss[ing] an indictment

on sufficiency grounds,' and the district court lacks the authority 'to require the government,

before trial, to make such a presentation' as this 'could effectively force a summary judgment-like

motion on the government.'" *Id.*

### b. Grand Jury Minutes

Grand jury proceedings are afforded a "presumption of regularity." *United States v.*

*Salameh*, 152 F.3d 88, 110 (2d Cir. 1998); *see also, e.g., United States v. Mechanik*, 475 U.S. 66,

75 (1986) (O'Connor, *J.*, concurring); *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994).

Maintaining the secrecy of grand jury proceedings is a "long-established policy" of the federal

courts. *Dennis v. United States*, 384 U.S. 855, 869 (1966). Indeed, "[t]here is a tradition in the

United States, a tradition that is 'older than our Nation itself,' that proceedings before a grand jury

shall generally remain secret." *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997) (quoting

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959)). As the Supreme Court

has explained, grand jury secrecy is central to our criminal justice system, because "[t]he grand

7

jury as a public institutional serving the community might suffer if those testifying today knew that the secrecy of their testimony would be lifted tomorrow." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958). Because of the "indispensable secrecy of grand jury proceedings," *United States v. Johnson*, 319 U.S. 503, 513 (1943), disclosure is permissible only "where there is a compelling necessity." *Procter & Gamble Co.*, 356 U.S. at 681. In order to obtain disclosure, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity that outweighs the Government's and the Grand Jury's substantial interest in secrecy." *United States v. Helbrans*, 547 F. Supp. 3d 409, 434 (S.D.N.Y. 2021) (citing *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001) and *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983)); *see also Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979) ("[I]n considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries."); *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct.").

### c. Elements of the Charged Offenses

The elements of obstruction of justice, in violation of Title 18, United States Code, Section 1512(c)(2), are that a defendant obstructs, influences, or impedes any official proceeding, or attempts to do so. An "official proceeding" includes "a proceeding before a Federal Government agency which is authorized by law." 18 U.S.C. § 1515(a)(1)(C). Such an "official proceeding" includes when a defendant knows of a government criminal investigation, because a grand jury proceeding is thus foreseeable to the defendant. *E.g. United States v. Persico*, 645 F.3d 85, 108 (2d Cir. 2011).

The elements of bank fraud conspiracy, in violation of Title 18, United States Code, Section 1349, are that there was an "(1) an agreement between at least two people to commit an unlawful act, and (2) the defendant's knowing engagement in the conspiracy with the specific intent that the object of the conspiracy be committed." *United States v. Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018). In turn, the elements of bank fraud are that a person "knowingly executes, or attempts to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." *United States v. Ferrara*, 788 F. App'x 748, 753 (2d Cir. 2019) (summary order).

Finally, there are three elements to a violation of 18 U.S.C. § 1014: (1) that the defendant made a "false statement or report," (2) "for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation," (3) "upon any application . . . or any change or extension of any of the same." Materiality is not an element of a Section 1014 charge. *United States v. Wells*, 519 U.S. 482 (1997).

## B.  Discussion

### 1.  The Motion to Dismiss Should Be Denied

The Indictment describes the essential elements of each charge and easily satisfies the bare-bones requirement that its allegations "track the language of the statute charged" and "state the time and place (in approximate terms) of the alleged crime." *United States v. Walsh*, 194 F. 3d 37, 44-45 (2d Cir. 1999) (citation and internal quotation marks omitted). As described above, numerous statements Skrapalliu made to Agent-1 on November 19 and 20, 2020 were false, including that she repeatedly told the agent that the $180,000 which CS-1 had wired had been sent to repay her for a loan extended to CS-1; and that the only parties to the loan were herself, CS-1,

9

and CS-1's wife.  In truth, and as Skrapalliu knew, CS-1 wired the $180,000 to pay *Iseni* back, not

Skrapalliu, and Iseni was integrally involved in the transfer.

Count Nine states that Skrapalliu committed the offense because she "made false

statements and provided false information to a federal law enforcement officer for the purpose of

interfering with an ongoing investigation into Abduraman Iseni."  As the facts described above

make clear, Skrapalliu understood that the Government was investigating the source and purpose

of the money received by the RJM Chase Account: she was informed, repeatedly, by Agent-1 that

the FBI was reviewing information about CS-1's wire, including the information she provided,

and she had been referred by Chase Bank to the FBI.  Further, on November 19, Agent-1 told

Skrapalliu "if this transaction was for like a legitimate economic reason, then, you know, the

government would not be entitled to hold this money and neither would Chase."  The following

day, after Skrapalliu provided false information, Agent-1 reiterated, "The reason I'm calling you

is because you know my supervisor kind of reviewed that report that I prepared and he just had

some follow up questions . . . we're working to resolve this situation."  Nonetheless, Skrapalliu

lied to Agent-1 about the nature of the transfers from CS-1, concealing Iseni's involvement.  *E.g.*

*Persico*, 645 F.3d at 108 (when a target "had been informed by the government that he was the

target of an investigation . . . a grand jury proceeding on that matter was thus foreseeable.").

Similarly, Counts Ten and Eleven of the Indictment allege that Skrapalliu conspired with

Iseni to commit bank fraud, and made false statements to Chase via Agent-1.  Her false statements

to Agent-1, which Iseni tried to buttress by convincing CS-1 to provide the same information, were

designed to convince Chase to allow her to unfreeze the RJM Chase Account so that she could

retrieve the funds.  In spelling out this information, the Indictment supplies sufficient notice and,

in fact, provides more detail than is required.  *See United* States *v. Rubin*, 743 F.3d 31, 38 (2d Cir.

10

2014) (noting that "an indictment need only allege that a defendant committed a federal criminal offense at a stated time and place in terms plainly tracking the language of the relevant statute[]").

In response, Skrapalliu's Motion to dismiss the Indictment offers nothing except factual challenges to the sufficiency of the evidence. But whether the Government can establish the elements in the Indictment beyond a reasonable doubt is for a jury to decide, not for this Court to determine whether Skrapalliu's "thorough accounting" is legitimate. Skrapalliu Motion at 1. Skrapalliu may of course argue to a jury that "[s]he had every reason to believe" the $180,000 "represented the repayment of her loan," Skrapalliu Motion at 2. But it is not for this Court to "evaluate the adequacy of the facts to satisfy the elements of the charged offense." *Dawkins*, 999 F.3d at 780. Skrapalliu's Motion to Dismiss should thus be denied. In sum, to the extent that Skrapalliu believes that the Government's proof will not substantiate the charges, such issues are properly resolved at trial. *See, e.g.*, *United States v. Casamento*, 887 F.2d 1141, 1182 (2d Cir. 1989) ("[A]n indictment, if valid on its face, may not be challenged on the ground that it is based on inadequate evidence."); *United States v. Butler*, S1 04 Cr. 340 (GEL), 2004 WL 2516672, at *3 (S.D.N.Y. Nov. 4, 2004) (Lynch, J.) ("[I]t is hornbook law that a federal defendant may not challenge a facially-valid indictment . . . on the ground that it is based on insufficient evidence."); *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("It is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency."), *aff'd*, 17 F.3d 572 (2d Cir. 1994).

## 2. The Motion for Inspection of Grand Jury Minutes Should Be Denied

Skrapalliu has not and cannot meet the heavy burden required to inspect the grand jury minutes. Skrapalliu simply repeats her arguments in support of her motion to dismiss to seek the grand jury minutes. Skrapalliu Motion at 4 ("In light of the arguments raised in POINT I, supra,

11

the grand jury must not have been properly charged."). But that is not the relevant legal standard. Skrapalliu offers no "particularized need" or procedural irregularity. Instead, she offers mere (and baseless) speculation based on her own proffered version of the facts. Motion at 4 ("the grand jury *must not have been properly charged*") (emphasis added). But such "speculative arguments are precisely the type that courts in this district have routinely rejected as [a] basis for vitiating grand jury secrecy." *Helbrans*, 547 F. Supp. 3d at 435 (collecting cases). Because the Indictment is facially valid, and because Skrapalliu's claims are speculative and fall short of demonstrating a "particularized need" that "outweighs the need for secrecy," *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978), Skrapalliu's Motion should be denied.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motion to dismiss and for grand jury minutes.

Dated: New York, New York
        November 23, 2022

                            Respectfully submitted,

                            DAMIAN WILLIAMS
                            United States Attorney

By:     /s/
                            Samuel Raymond
                            David R. Felton
                            Assistant United States Attorneys
                            (212) 637-6519 / -2299

12